IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>vs.<br><br>JAVARIO DEVON ROBINSON,<br><br>*Defendant.* | DOCKET NO. 5:23-CR-38-KDB<br><br>**MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM OF LAW** |

Javario Robinson, through counsel, Assistant Federal Public Defender Rhett H. Johnson, moves this Court, pursuant to Rule 12 of the Federal Rules of Criminal Procedure and the Fourth Amendment to the United States Constitution, to suppress all evidence obtained as a result of the search of his home on April 6, 2023. Should this Court not summarily grant this motion on the pleadings, Robinson moves this Court to conduct a *Franks* hearing in this matter.

I.  GROUNDS FOR SUPPRESSSION

  a.  The search warrant in this matter is facially invalid as it fails to establish probable cause and the necessary nexus between criminal activity and the place to be searched.

  b.  The search conducted pursuant to the search warrant was unreasonable because the search warrant contains materially false statements and omissions in violation of *Franks v. Delaware,* 438 U.S. 154 (1978).

1

## II. FACTUAL BACKGROUND[1]

### a. Response to 911 Call

In the early afternoon of April 26, 2023, several Hickory Police Department officers responded to a 911 call about shots fired near 430 Center Street, Hickory, North Carolina. Officer Carter and Officer Adkins were the first to arrive on the scene. There they encountered Javario Robinson lying on the walkway in front of his home with a gunshot wound to his leg.



*Screenshot from Officer Adkins BWC Footage*

---

[1] The facts set forth herein are based on the body-worn camera ("BWC") footage provided in discovery. The BWC footage is relatively voluminous due to the number of uniformed officers involved. Because the instant motion is a facial challenge to the search warrant along with a narrow *Franks* challenge, the factual background is meant to provide facts germane to those purposes along with contextual background information.

2

They both provided medical aid to Robinson. While Officer Carter applied a tourniquet band to Robinson's leg, Officer Adkins radioed for EMT assistance and confirmed that the "scene is secure." *See* Exhibit 1 (Officer Adkins BWC at 3:34:39 p.m. (2:08)).[2] When asked about the assailant, Robinson advised that he was struck by a stray bullet and was unable to provide any additional details except that in the moments leading up to being shot, there were several people arguing at a nearby apartment complex. EMT personnel soon arrived and began administering medical care to Robinson before he left in an ambulance. *See* Exhibit 1 (Officer Adkins BWC at 3:49:10 p.m. (16:39) (ambulance leaving scene)).

The only other two people consistently present outside Robinson's home throughout the encounter was his father, Arthur Robinson, and an acquaintance, who advised her name was Caroline Corpening.[3] Arthur Robinson echoed Javario's account of what happened. He told officers that he and Javario were sitting on the front porch before Javario stepped out onto the front walkway and was immediately struck by a bullet. Neither Javario Robinson nor his father were able to provide a description of the shooter.[4]

---

[2] The timestamps for the BWC footage referenced herein reflect both the real time in standard time format and the minute/second mark of the attached video file, respectively.
[3] Officers later determined this was not her actual name.
[4] Hours later, after the search warrant was executed, and while still in the hospital, Javario Robinson confessed that he had accidentally shot himself.

3

### b. Protective Sweep

At around 3:47 p.m., approximately 14 minutes after officers first arrived, Lieutenant Miller and Officer Carter discussed searching the home. Lieutenant Miller advised Officer Carter, "I'm not so sure that the gun is not in there [Robinson's home] and the female is involved...." *See* Exhibit 2 (Officer Carter BWC at 3:47:49 p.m. (14:38)). Officer Carter then asked Lieutenant Miller, "For officer safety, am I allowed to search the house?" *See* Exhibit 2 (Officer Carter BWC at 3:48:09 p.m. (14:58)). Lieutenant Miller agreed that they should search the house. The officers moved towards the front porch of the home where Arthur Robinson was sitting by the front door. Lieutenant Miller advised Arthur Robinson that "we need to go in the residence just to see if that bullet traveled through, or if there is anybody else in there hurt." *See* Exhibit 1 (Officer Adkins BWC at 3:49:56 p.m. (17:24)). Arthur Robinson told her that the door was locked and he did not have the key. For the next several minutes, Lt. Miller continued to discuss the matter with Arthur Robinson. *See* Exhibit 3 (Lieutenant Miller BWC 3:50:10 p.m. (15:00)).

Around this time, investigators from the Criminal Investigations Division ("CID") arrived on the scene where several officers briefed them on the situation. *See* Exhibit 1 (Officer Adkins BWC at 3:54:45 p.m. (22:13)). Lieutenant Miller advised the other officers that "we need in that house cause I'm thinking the gun is in that house...." *See* Exhibit 1 (Officer Adkins BWC at 3:58:40 p.m. (26:09)). Around 4:00 p.m.—approximately 27 minutes after officers first arrived on the scene—CID Investigator Helderman approached Arthur Robinson on the front porch and told him

4

the police were required to sweep the house to verify no one else is injured inside. *See* Exhibit 1 (Adkins BWC at 4:00:18 p.m. (27:47)). Arthur Robinson maintained that he did not have a key and no one else was present inside the house. A couple minutes later, the officers kicked in the front and conducted what they claimed to be a "safety sweep" of the residence. Towards the end of the sweep, Officer Adkins remarked, "I didn't see a firearm anywhere." *See* Exhibit 1 (Officer Adkins BWC at 4:07:23 p.m. (34:52)).

      c.    **Search Warrant Execution**

Shortly after the officers completed their protective sweep of the home, at around 4:38 p.m., Investigator T. Johnson applied for a search warrant to search the entire premises of 430 Center Street. *See* Exhibit 4 (Search Warrant). The officers searched the home and uncovered the firearms that are the subject of the instant indictment. In pertinent part, Investigator T. Johnson swore under oath that "[w]hen Officer [sic] attempted to secure the residence, Robinson's father who is heavily intoxicated slammed and locked the door." *See* Exhibit 4 (Search Warrant). However, from a review of the comprehensive BWC footage, it is clear that no officer observed Robinson's father slam or lock a door to the home. The door was closed when they first arrived, and it remained closed until the officers forced entry to perform a protective sweep.

5

## III. LEGAL STANDARD

### a. Search Warrants Must Be Supported by Probable Cause

A search warrant may only be issued upon a showing that probable cause exists to search the described location. *See* U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). In reviewing the probable cause determination by a judicial officer, "the task of the reviewing court is not to conduct a *de novo* determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984). As such, "when reviewing the probable cause supporting a warrant, a reviewing court must consider only the information presented to the magistrate who issues the warrant." *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996); *see also United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) ("[W]e consider only the facts presented in the warrant application.").

"Probable cause" to search is described as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]o establish probable cause, the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found." *United States v. Williams,* 972 F.2d 480, 481 (4th Cir. 1992) (per curiam) (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983) (plurality opinion)); *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996). "In determining whether

6

a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993).

To meet this standard, the affidavit supporting the application for a search warrant must demonstrate the existence of a "nexus between the place to be searched and the items to be seized." *United States v. Anderson*, 851 F.2d 727, 729 (4th Cir. 1988). This nexus can be established by the nature of the item and the normal inferences of where a person would keep such evidence. *Id.*

### b. *Franks v. Delaware*

Search warrant applications must be made in good faith and be supported by truthful information. In *Franks*, the Supreme Court held that the accused is entitled to an evidentiary hearing on the veracity of statements in the search warrant affidavit upon a showing that that the affidavit contains intentional or reckless falsehoods. 438 U.S. at 155-56. To obtain a *Franks* hearing, "a defendant must make a substantial preliminary showing that (1) law enforcement made a false statement; (2) the false statement was made knowingly and intentionally, or with reckless disregard for the truth; and (3) the false statement was necessary to the finding of probable cause." *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019) (citation omitted). With respect to the final prong, if the Court finds the search warrant was based in part on the false statement, the Court must excise the false statement from

7

the affidavit and assess whether the remaining facts support a finding of probable cause. *Id.* at. 371.

The Fourth Circuit addressed when a *Franks* hearing is required based on the theory that the officer's affidavit "omit[ted] material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir.1986)). Under *Colkley*, the defendant must show (1) that the officer deliberately or recklessly omitted the information at issue and (2) that the inclusion of this information would have defeated probable cause. *See* 899 F.2d at 301. The doctrine applies to both false statements and omissions. *Id.* at 300 (internal citations omitted). And, the *Franks* test applies "when affiants omit material facts 'with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading.'" *Colkley*, 899 F.2d at 300 (quoting *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986)).

IV. **ARGUMENT**

   a. **The search warrant is facially defective because the supporting affidavit failed to describe sufficient facts to support a probable cause determination that evidence of a shooting would likely be found in Robinson's home**

In this matter there is a wholly insufficient nexus between any criminal activity and the home to be searched. In evaluating whether the issuing magistrate had a "substantial basis" for finding probable cause that evidence of a shooting would be found in Robinson's home, the Court "may not go beyond the information actually

8

presented to the magistrate during the warrant application process." *United States v. Lyles*, 910 F.3d 787, 791 (4th Cir. 2018) (cleaned up).

The search warrant affidavit in for Robinson's home is structured as follows:

1. The first paragraph describes the affiant's background and experience.

2. The second paragraph provides that the Hickory Police Department received a call for service in reference to a male with a single gunshot wound to the leg at 430 S Center St, Hickory, North Carolina.

3. The third paragraph **falsely** states that "When Officer [sic] attempted to secure the residence, Robinson's father who is heavily intoxicated slammed and locked the door." It correctly states that the officers on scene forced entry to secure the residence.

4. The fourth paragraph mentions that a neighbor had advised officers that "she heard yelling and arguing coming from 430 S Center St and then heard one gunshot."

5. The fifth paragraph states that "Javario Robinson has been charged several times for narcotics in the past and through my training and experience, drug user[sic] and dealer [sic] keep narcotics at their home."

6. The sixth paragraph states that the "Affiant believes that the above facts provide probable cause to believe that evidence of shooting may be inside the residence as well as a firearm involved."

*See* Exhibit 4 (Search Warrant).

As an initial matter, the only assertion that supports the conclusion that a crime had been committed was the fact that Javario Robinson had been shot and was lying in front of his house located at 430 S. Center Street. But this alone, without more, does not give rise to an inference that the shooter or weapon responsible for the

9

shooting would be found inside the house. There is no information in the search affidavit about a suspected shooter or weapon whatsoever. Moreover, there is no information contained on the face of the warrant to support an inference that the shooting occurred inside the home. As discussed above, Robinson's father did not slam the door in the officer's presence. But *assuming arguendo* that he did, this too, without more, hardly supports an inference that evidence of the shooting would be located inside the home. Every American enjoys the right to keep the government out of their home as emphatically as they please, so long as they do not threaten nor harm another in the process. And while slamming a door could arguably be viewed as scant evidence of suspicious behavior or an attempt to conceal evidence, this belligerent behavior (that did not occur) could also be attributed to his "heavily intoxicated" state.

Likewise, that Javario Robinson had been **charged** (not convicted) with narcotics in the unspecified past likewise does little to move the needle towards the conclusion that evidence of the shooting may be found **inside** the home. "A valid search warrant may issue only upon allegations of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause *at that time*." *United States v. Doyle*, 650 F.3d 460, 474 (4th Cir. 2011) (quoting *United States v. McCall*, 740 F.2d 1331, 1335-36 (4th Cir. 1984)) (emphasis in original). Here, the claim related to prior narcotics charges lack temporal relevance given that it does not say when he was alleged to be involved with narcotics. And to the extent there is any qualitative relevance between Robinson's past involvement with drugs and the

10

instant shooting, this would seem to point away from his home, not towards it. An assailant in a drug-related shooting is unlikely to shoot someone outside and then take cover in the victim's own home.

> **b.  The Affidavit in Support of the Search Warrant Contained Material Misstatements of Fact and Made Material Omissions in violation of *Franks***

In her affidavit, Investigator T. Johnson falsely states that, "When Officer [sic] attempted to secure the residence, Robinson's father who is heavily intoxicated slammed and locked the door." *See* Exhibit 4 (Search Warrant).

Undersigned counsel has reviewed the BWC footage provided in discovery. Collectively this footage continuously captures the entire encounter between the responding officers, Javario Robinson, his father, and the front porch area of the home from the time the officers first arrived through the execution of the search warrant. At no point is Robinson's father seen slamming or locking any door. The front door is closed when the officers arrived, and it remained closed until an officer kicked it in to perform the protective sweep. The BWC footage makes clear that Investigator Johnson's statement was false. Accordingly, Robinson is entitled to a *Franks* hearing.

Once this erroneous fact is stripped away from the affidavit, all that is left in support of a criminal act involving a firearm is the fact that Javario Robinson was shot in front of his home. This does not give rise to a fair probability that evidence of the shooting will be located inside Robinson's home.

What's more, the warrant affidavit omitted material facts. The warrant accurately stated that "officers forced entry" into the home. However, the affidavit

11

omitted the fact that the officers entered and conducted a sweep of the home to search for a firearm. It also omitted that the search was unsuccessful, with Officer Adkins remarking, "I didn't see a firearm anywhere." *See* Exhibit 1 (Officer Adkins BWC at 4:07:23 p.m. (34:52). That officers entered the home, looked inside every room and were unable to locate a firearm or any other evidence related to the shooting was material to the magistrate's determination of probable cause.

V.   **CONCLUSION**

"[C]ourts must . . . insist that the magistrate purport to 'perform his neutral and detached function and not serve merely as a rubber stamp for the police.'" *United States v. Leon*, 468 U.S. 897, 914 (1984) (quoting *Aguilar v. Texas*, 378 U.S. 108, 111 (1964)). Where there is no probable cause to justify the issuance of a search warrant, all subsequently obtained evidence, either tangible or testimonial, obtained as a direct result of an illegal search should be excluded as fruit of the poisonous tree. *See Utah v. Strieff*, 592 U.S. 232, 237 (2016); *Murray v. United States*, 487 U.S. 533, 536-537 (1988).

Here, the complete lack of a nexus between the criminal evidence sought and the place to be searched renders any reliance on the search warrant as unreasonable. Investigator Johnson's materially false statement that Robinson's father slammed and locked the door was seemingly made entirely out of whole cloth and its inclusion is the only "fact" that supports an inference that there is something of evidentiary value inside the house. After excising this fact and reviewing what is left, there is little more than Javario Robinson, who has prior drug charges in the unspecified

12

past, lying in the walkway in front of his home with a gunshot wound to the leg. And her omission of the fact that the officers looked inside every room of the home and uncovered no additional evidence of criminal activity just minutes before seeking the search warrant further undermines the validity of the warrant.

For these reasons, the defendant respectfully moves this Court to suppress all evidence obtained as a result of the search of 430 Center Street, Hickory, North Carolina on April 6, 2023.

Dated: February 2, 2024        Respectfully Submitted,

s/**Rhett H. Johnson**
Rhett Hunter Johnson
W.Va. Bar #12114
N.C. Bar #35365 (inactive)
Assistant Federal Public Defender
Federal Public Defender for the
Western District of North Carolina
1 Page Avenue, Suite 210
Asheville, NC 28801
Phone: (828) 232-9992
Fax: (828) 232-5575
E-Mail: Rhett_Johnson@fd.org