IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    *Plaintiff,*<br><br>vs.<br><br>JAVARIO DEVON ROBINSON,<br><br>    *Defendant.* | DOCKET NO. 5:23-CR-38-KDB<br><br>**DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS** |

    Javario Robinson, through counsel, Assistant Federal Public Defender Rhett H. Johnson, previously filed a Motion to Suppress in this matter, asserting both a facial and *Franks* challenge to the search warrant. Dkt. No. 19 ("Mot. to Suppress"). The Government submitted its Response, Dkt. No. 22 ("Gov't Response"), that characterizes parts of Robinson's claims as "egregious" and "troubling." Robinson now offers this Reply.

    First, the Government claims that Officer Johnson's statement about Robinson's father slamming and locking the door when officers attempted to secure the residence is factually accurate, when the BWC evidence shows that it is not. Second, the Government argues that Robinson has not made the necessary showing to establish the falsity of Officer Johnson's sworn statement, notwithstanding the BWC footage tendered as exhibits to Robinson's Motion that clearly demonstrates as much. Finally, with respect to the omitted information regarding the protective

1

sweep, the Government claims that the sweep was not conducted for the purpose of finding a firearm, but the BWC footage amply demonstrates that this was at least one of the real purposes behind the preliminary search.

Robinson will address each of these points below.

**1. Officer Johnson's Statement About Robinson's Father "Slamming and Locking" the Front Door "When Officers Attempted to Secure the Residence" <u>is Demonstrably False.</u>**

At issue is the following verbatim sworn statement made by Officer Tammie Johnson in support of the search warrant application:

> *When Officer attempted to secure the residence, Robinson's father who is heavily intoxicated slammed and locked the door. Officers force entry to secure the residence. [sic]*

Mot. to Suppress, Exhibit 5 (Search Warrant).

By any ordinary reading of this passage, the reader would be led to believe that the events in question occurred in the following sequence:

1. Officers attempted to secure the residence.
2. Robinson's heavily intoxicated father then slammed and locked the door.
3. Officers forced entry to secure the residence.

The BWC evidence establishes a distinctly different chain of relevant events:

1. When the first responding officers arrived, the front door of the residence was closed.
2. The door remained close for nearly half an hour until an officer kicked it in to force entry.

2

When or how Robinson's father may have closed the door is not captured on any of the responding officers' body-worn cameras. This is because it would have occurred well before any of the officers arrived. The BWC evidence plainly shows that Robinson's father did not slam the door while officers "attempted to secure the residence," as sworn to by Officer Johnson.

Next, the Government argues there is little meaningful difference between "closing" and "slamming" a door. *See* Gov't Response at 11 ("Regardless of whether Arthur Robinson's closing of the door could be considered slamming, it does little to negate the fact that he was heavily intoxicated, closed the door, *locked* it, and then admitted to doing so." (emphasis in original)). But ordinary use and understanding of the words "close" and "slam" evoke two very different pictures, with "slamming" connoting an enhanced degree to force or defiance in response to the officers (who were not yet on the scene). Regardless, these distinctions are of no consequence because no officer observed when or how Robinson's father closed the front door.

The BWC footage clearly shows that the front door to the residence was closed when the officers first arrived. *See* Mot. to Suppress at 2 (screenshot of from Officer Adkins BWC footage showing front door closed).[1] It also shows that the door remained closed until the officers forced entry. At no point does Robinson's father "slam and lock" the door in response to the officers' attempt to secure the residence.

---

[1] Officer Adkins, along with Officer Carter, were the first officers to arrive to Robinson's home.

3

Case 5:23-cr-00038-KDB-SCR   Document 24   Filed 02/29/24   Page 3 of 11

The Government asks this Court to ignore this fact, and even goes one step further by asserting that Officer Johnson's statement is "demonstrably true." Gov't Resp. at 5. But the Government fails to follow through by demonstrating how Officer Johnson's statement is—or even could be—true. Rather, it asserts that Robinson's father's act of closing the front door at some earlier time **before the officers even arrived** is somehow equivalent to "slam[ming] and lock[ing] the door" "[w]hen Officer [sic] attempted to secure the residence." The Government then claims that the fact Robinson's father admitted to closing the door some unknown amount of time before officers arrived on the scene somehow bolsters Officer Johnson's version of events. *See id.* at 8 ("More importantly, officers documented in their report that Arthur Robinson admitted to closing and locking the door[.]"). It does not. Likewise, Arthur Robinson's admission to having "done locked the damn door[,]" does little to bring Officer Johnson's sworn statement closer to the truth. *See id.* The difference between Robinson slamming and locking the door when the officers attempted to secure the residence (what Officer Johnson swore happened) versus his admission to having previously "locked the damn door" before the officers arrived (what actually happened) is manifest. So, unless the Government can explain (1) how the officers attempted to secure the home before they had even arrived at the residence, and (2) how they became aware of the manner in which Arthur Robinson closed the door prior to their arrival, this alternative explanation cannot hold up.

The Government further argues, "[w]hat's more, Defendant makes the erroneous assertion that Officer Johnson simply made up the fact Arthur Robinson

4

'slammed and locked' the front door because he didn't see it on bodycam." *Id.* at 8. The question, however, is not one of defense counsel's perception. It is a fact that every moment of the officers' response to the residence was recorded. And it is a fact that there is no footage—on any of the myriad videos, from any of the myriad angles—showing either that the door was open before officers arrived on the scene or that Arthur Robinson slammed or even closed the front door as officers attempted to secure the residence. Based on this demonstrably false evidence, Robinson has made the requisite "preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit." *Franks v. Delaware*, 438 U.S. 154, 156 (1978). And, because this evidence was "necessary to a finding of probable cause" for the reasons outlined in the Motion to Suppress and below, "the Fourth Amendment requires" that this Court hold a hearing. *Id.*

2. **Robinson Has Made the Necessary Showing to Demonstrate that Officer Johnson Made a Materially False Statement in Support of the Search Warrant.**

The Government complains early and often that Robinson has failed to make a substantial preliminary showing to entitle him to a *Franks* hearing. Specifically, the Government claims that Robinson's motion only "makes general and conclusory references to discovery in this matter ... [and] does not include any supporting attachments containing affidavits or any other evidence." *Id.* at 7; *see e.g., id.* at 8 ("[l]ooking past the absence of any supporting evidence").

5

But as discussed in the previous section, Robinson has provided a sufficient offer of proof by way of contemporaneously recorded BWC footage attached as exhibits to his Motion to Suppress. This footage, individually and collectively, proves the falsity of Officer Johnson's claim regarding the "slammed and locked" door. Robinson included BWC videos from the first two responding officers that establishes the front door of Robinson's house was closed when they first arrived, *see* Mot. to Suppress, Exhibits 1 and 2 (Officers Adkins and Carter BWC Footage, respectively), and another video, *id.* at Exhibit 3 (Lieutenant Miller BWC Footage), that demonstrates the door remained close until the forced entry.[2] Neither an affidavit nor a witness statement could establish this fact any more conclusively. Moreover, these are not merely "general and conclusory references to the discovery" as the Government claims. *See* Gov't Response at 7. Rather, these references are pinpoint citations to the relevant portions of the BWC footage from the first responding officers. It is difficult to imagine more substantial proof of an event's non-occurrence than video evidence of the event's absence during the time it supposedly occurred. *Cf. United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022) ("when an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements."). The Government simply chose not to squarely confront this BWC video evidence in its Response, opting instead to lean on information

---

[2] Several additional BWC videos from responding officers were provided in discovery. These videos capture nearly all angles of most of the events at issue. However, their inclusion would be unnecessarily cumulative on this point. The Government's failure to point to any of the absent footage to contradict this point suggests tacit agreement.

6

contained in the officers' reports. But the information contained in these reports do not cast any doubt on the pertinent BWC evidence. Beyond that, reliance on these reports for information not contained in the search warrant application itself is of dubious significance. *See, e.g., United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir. 1996) (probable cause review limited to information presented in search warrant application).

Officer Johnson's false statement concerning Robinson's father slamming the door when officers attempted to secure the residence is highly material. According to the Government's own probable cause analysis, evidence of yelling and arguing coming from Robinsons' front yard, "combined with the blood in front of the home, and the furtive behavior of the occupants of 430 S. Center St., established a sufficient nexus between the crime and the home." *Id*. at 10. So, by the Government's own admission, aside from the gunshot wound itself and the unremarkable discovery of blood on the ground where the wounded person lay, the only "facts" that lend reason to suspect evidence of the "crime" inside the house, was the "furtive behavior of the occupants" and a single neighbor's claim that she heard (but did not see) yelling and argument coming from outside the residence. And the only evidence of furtive behavior listed within the four corners of the warrant application is the false claim that Arthur Robinson slammed and locked the door when the officers attempted to secure the residence.

After excising this false statement about the slammed door, all that is left is a gunshot victim laying in the front yard of his home, where a neighbor[3] had recently heard "yelling and arguing." The inclusion of this false statement is material because the remaining quantum of evidence falls well short of reaching the probable cause threshold.

3. **The Protective Sweep of the Home was Pretextual in Nature and the Fact that it Yielded Nothing of Evidentiary Value Should Have Been Disclosed to the Magistrate**

In his Motion to Suppress, Robinson argues that "Officer Johnson omitted information that the officers entered and conducted a sweep of the home to conduct a search for a firearm." Mot. to Suppress at 9. The Government argues that this is "incorrect" and "merely a self-serving and conclusory statement impugning the credibility of the officer without support." Gov't Response at 11. Moreover, the Government goes so far as to say that it is "troubling" that Robinson "alleges that officers were looking for a firearm when multiple officers articulated multiple times to Defendant, his father, and 'Corpening' that they needed to get into the home to conduct a protective search."[4]

---

[3] While the Government's Response provides a lengthier recitation of information gathered from "neighbors," the search warrant affidavit only references information provided by a single neighbor, i.e., "[a] neighbor told Officers that she heard yelling and arguing coming from 430 S Center St and then heard one gunshot." For the sake of factual clarity, this is not the same neighbor who called 911 and referenced a tall man entering the home that the Government discusses in its Response.

[4] Relatedly, neither the narrative reports nor the BWC evidence demonstrate that any of the officers advised the Defendant, Javario Robinson, of their need to conduct a protective sweep. But in any event, this is limited significance since there was no mention of this in the warrant affidavit.

8

But again, as the BWC evidence shows, at least one of the officers' true motivations behind the protective sweep was to locate a firearm. Prior to the protective sweep, Lieutenant Miller advised Officer Carter, "I'm not so sure that the gun is not in there [Robinson's home] and the female is involved…" *See* Mot. to Suppress, Exhibit 2 (Officer Carter BWC at 3:47:49 p.m.) (14:38)). Ten minutes later, still before the protective sweep, Lieutenant Miller advised other responding officers that "we need in that house cause I'm thinking the gun is in that house…." *Id.* at Exhibit 1 (Officer Adkins BWC at 3:58:40 p.m. (26:09)). And again, towards the end of the protective sweep of the home, Officer Adkins remarked, "I didn't see a firearm anywhere." *Id.* at Exhibit 1 (Officer Adkins BWC at 4:07:23 p.m. (34:52)).

So, the prosecutor's claim that the "[o]fficers were not looking for firearms at this juncture, only injured persons, or a possible suspect" is at odds with the officers' own statements. *See* Gov't Response at 11. The Government's reliance on alleged concern over a possibly injured person or child does little to undermine the fact that the officers' true, **stated** purpose was to search for evidence. *Cf. Miller*, 54 F.4th at 228 ("when an officer's testimony is clearly contradicted by video evidence, the court should normally discount the testimonial statements."). Additionally, had the officers harbored genuine concern over an injured person inside the home, it is fair to expect they would not have waited for nearly **half an hour** before forcing entry to render aid.

As far as Officer Johnson's decision to omit the fact that officers had swept the interior of the house and found nothing when applying for a search warrant for the

9

same house, it seems strikingly self-evident that any neutral and detached judicial officer would find this information useful in deciding whether to make a finding of a probable cause that evidence of a crime may be found inside of the residence.

## Conclusion

It is clear from the objective evidence presented that what actually happened differs significantly from what Officer Johnson claimed happened in her search warrant affidavit. The Government attempts to reconcile the inconsistencies between the BWC footage and Officer Johnson's sworn statement by ignoring the sequence of relevant events, or claiming they do not matter, and by twisting the plain meaning of ordinary words like "when" and "slam." Robinson asks this Court to decline the Government's invitation to sidestep the plain and ordinary understandings of these common words.

Robinson has made a substantial preliminary showing that the search warrant affidavit contains materially false information, and he is entitled to a *Franks* hearing. Alternatively, from the evidence previously submitted—the BWC footage—this Court has ample evidence to make a finding that the affidavit contained misstatements that relate to the nonexistent "furtive movements" relied upon by the Government it its probable cause analysis. Accordingly, this Court can excise that portion of the affidavit and evaluate whether what remains is sufficient to establish probable cause. Robinson maintains that it is not.

Dated:  February 29, 2024                    Respectfully Submitted,

s/**Rhett H. Johnson**
Rhett Hunter Johnson
W.Va. Bar #12114
N.C. Bar #35365 (inactive)
Assistant Federal Public Defender
Federal Public Defender for the
Western District of North Carolina
1 Page Avenue, Suite 210
Asheville, NC 28801
Phone: (828) 232-9992
Fax: (828) 232-5575
E-Mail: Rhett_Johnson@fd.org
